Jay GUNDERSON, Roslyn Gunderson, et al., Plaintiffs,

v.

ADM INVESTOR SERVICES, INC., et al., Defendants.

Gary Hoover, Marilyn Hoover, et al., Plaintiffs,

v.

ADM Investor Services, Inc., et al., Defendants.

Nos. C96–3148–MWB, C96–3151–MWB.

United States District Court, N.D. Iowa, Central Division.

Feb. 28, 2000.

Joel J. Bellows, Nicholas P. Iavarone, Christopher L. Gallinari, Bellows & Bellows, Chicago, IL, Richard H. Moeller, Dawn E. Mastalir, Berenstein, Moore, Berenstein, Moore, Berenstein, Heffernan & Moeller, Sioux City, IA, for Plaintiffs.

Terry F. Moritz, Kenneth S. Ulrich, Golberg, Kohn, Bell, Black, Rosenbloom &

Moritz, Ltd., Chicago, IL, Steven C. Schoenebaum, Richard K. Updegraff, Brown, Winick, Graves, Gross, Beaskerville & Schoenebaum, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT GRAIN ELEVATORS' MOTION TO DISMISS

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .......................................................896

II. FACTUAL BACKGROUND ...........................................898

III. LEGAL ANALYSIS ..................................................——
 A. Standards For Motions To Dismiss .............................902
 B. CEA Fraud Claims ............................................902
 1. Pleading requirements of FED. R. CIV. P. 9(b) .............903
 2. The pleading of fraud in Counts VI and IX ...............905
 3. Dismissal with prejudice ................................907
 C. Count VI's Allegations Of Excessive Speculation .............907
 D. Count VIII's Failure–To–Register Allegations ................909
 E. Count XI–Commodity Trading Advisors Allegations ..........910
 F. Counts VI, VII, VIII And IX–Allegations Of Futures Contracts ...911
 G. Claims For Punitive Damages .................................913
 H. RICO Claims .................................................913
 1. Pleading fraud with particularity .......................914
 2. Pleading of elements of RICO ...........................914
 a. Conduct of the enterprise .........................915
 b. RICO Enterprise ..................................916
 c. Pattern of racketeering activity ...................916
 I. State Law Claims .............................................918
 1. Rescission ...............................................918
 2. Breach of fiduciary duty .................................920
 3. Fraudulent Inducement ..................................922
 4. Breach of Contract .......................................922
 5. Negligence claim ........................................922

IV. CONCLUSION ......................................................923

This opinion is the latest installment in a continuing succession of decisions in a plethora of cases in this district involving so-called "hedge-to-arrive" contracts (HTAs) for the sale and purchase of grain between grain producers and elevators. *See generally Gunderson v. ADM Investor Servs., Inc.*, 43 F.Supp.2d 1058 (N.D.Iowa 1999); *Johnson v. Land O' Lakes, Inc.*, 181 F.R.D. 388 (N.D.Iowa 1998); *Johnson v. Land O' Lakes, Inc.*, 18 F.Supp.2d 985 (N.D.Iowa 1998); *Barz v. Geneva Elevator Co.*, 12 F.Supp.2d 943 (N.D.Iowa 1998); *Top of Iowa Coop. v. Schewe*, 6 F.Supp.2d 843 (N.D.Iowa 1998); *Oeltjenbrun v. CSA Investors, Inc.*, 3 F.Supp.2d 1024 (1998); *Brown v. North Central F.S., Inc.*, 987 F.Supp. 1150 (N.D.Iowa 1997); *Gunderson v. ADM Investor Servs., Inc.*, 976 F.Supp. 818 (N.D.Iowa 1997); *Brown v. North Central F.S., Inc.*, 173 F.R.D. 658 (N.D.Iowa 1997); *North Central F.S., Inc. v. Brown*, 951 F.Supp. 1383 (N.D.Iowa 1996); *Farmers Co-operative Elevator of Buffalo Center v. Abels*, 950 F.Supp. 931 (N.D.Iowa 1996); *Farmers Co-Operative Elevator, Woden, Iowa v. Doden*, 946 F.Supp. 718 (N.D.Iowa 1996). In the two consolidated cases now before the court, the court is presented with the elevators' assertions that the grain producers' fraud claims have not been pleaded with sufficient particularity and that other counts in the grain producers' complaint fail to state claims upon which relief can be granted.

## I. INTRODUCTION

This case arises from hedge-to-arrive contracts ("HTAs"), contracts for the sale and purchase of grain, that were entered into by grain producers and grain elevators. On June 14, 1996, case No. C96–3148–MWB (*Gunderson*), was filed in the United States District Court for the Northern District of Illinois. Plaintiffs in *Gunderson* are a group of grain producers seeking declaratory judgment and other relief as described in greater detail below.[1]

1. The following individuals and entities were named as plaintiffs in the original complaint in *Gunderson:* Jay Gunderson and Roslyn Gunderson; Dan Abels; Agcel, Inc.; Asa–Brandt, Inc. a/k/a Asa–Brandt Partnership; Philip Asa; Keith Brandt; Robert Becker; Les Beekman; Ron Berschman d/b/a Phoenix Farms; Steve Berschman; SJMC, Corp.; Dennis Cink; Daryl Cushman; Davids Farms, Inc.; Duane Davids; Dale Kramersmeier and Diana Kramersmeier; Daniel DeWaard; Duane DeWaard; Laurence Doden; M & J Ennen Farms, Inc.; Ronny Ennen; Beverly Everett; Richard Gardner; Jerry Giesking; Rande Giesking; David Gerber; Hamilton County Land Corp.; Bruce A. Heetland; Heidecker Farms, Inc.; Steve Heyer; James L. Hofbauer; Ted Hoover; Janice Hoover; Jerry D. Johnson; Junkmeier Farms, Inc.; Ray Lichter; Tom Lichter; Lichter Brothers; Bradley Loucks; Bruce Meinders; Dale Meinders and Garry Meinders d/b/a Meinders Brothers; J & K Oftedahl, Inc.; John Oftedahl; Edward A. Otis; Jim Otis; Pitkin Farms, Ltd.; Jeff Pitkin; Sandale Farms, Inc.; Ronald Schmidt; Debra Schmidt; Schutjer Bros., Inc. f/k/a Schutjer Brothers; Dennis Schutjer; Reginald Schutjer; Wendell Schutjer; Steve Shortenhaus; Shawn Thomsen; Bill Walstead; Joyce Walstead and Cecil Welhousen.

2. Named as defendants in the original *Gunderson* complaint were: ADM Investor Services, Inc., ("ADM") a futures commissions merchant registered with the Commodity Futures Traders Commissions ("CFTC"); FAC–MARC, Inc. ("FAC–MARC"), a commodity trading advisor registered with the CFTC; Agri–Plan, Inc., ("Agri–Plan") and Competitive Strategies for Agriculture, Ltd. ("CSA"), both registered with the CFTC as introducing brokers of ADM; Farmers Cooperative Company ("Farmers Co-op"); Farmers Cooperative Elevator d/b/a Titonka Farmers Cooperative ("Titonka"); Farmers Cooperative Elevator of Buffalo Center, Iowa ("Buffalo Center"); The Farmers Co-Operative Society ("FCS"); West Bend Elevator Company ("West Bend"); Farmers Cooperative Elevator, Woden, Iowa ("FCE"); Bode Cooperative ("Bode Co-op"); Cylinder Cooperative Elevator Company ("Cylinder Co-op") and Cooperative Grain & Product Company ("Cooperative Grain"). Defendants Farmers Co-op, Titonka, Buffalo Center, FCS, West Bend, FCE, Bode Co-op, Cylinder Co-op and Cooperative Grain are all Iowa grain elevators.

3. The following grain producers were named as plaintiffs in the original *Hoover* complaint: Gary Hoover and Marilyn Hoover; Ronald L. Broderson; Edward Noonan; Noonan Farms, Inc.; John Olson and Philip Olson d/b/a Olson Farm; and Clarence Miller and Christian Miller d/b/a C & C Miller Farms. The following entities were named as defendants in the original *Hoover* complaint: ADM; FAC–MARC; Agri–Plan; CSA; Titonka; Buffalo Center; West Bend and FCE.

4. Both the original complaints in *Gunderson* and *Hoover* contained the following claims: Count I alleges a RICO violation, under 18 U.S.C. § 1962(d), by ADM; Count II alleges a RICO violation, under 18 U.S.C. § 1962(d), by ADM, FAC–MARC, Agri–Plan, and CSA; Count III alleges a RICO violation, under 18 U.S.C. § 1962(a), by ADM, FAC–MARC, Agri–Plan, and CSA; Count IV alleges fraud in violation of § 4b of the CEA, 7 U.S.C. § 6b, against ADM and CSA; Count V alleges that the HTAs are illegal because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(d). Count VI seeks declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)-(c) of the CEA, 7 U.S.C. §§ 6(a)-(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c (a)(10); Count VII alleges fraud in violation the Illinois Consum-

Plaintiffs alleged, *inter alia*, that defendants engaged in the promotion and marketing of HTAs in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*[2] Also on June 14, 1996, case No. C96–3151–MWB (*Hoover*), which likewise seeks declaratory judgment and other relief, was filed in the United States District Court for the Northern District of Illinois by a second group of grain producers.[3] Both the original complaints in *Gunderson* and *Hoover* asserted the same thirteen claims for relief.[4]

All of the grain producers will be referred to herein collectively as the Producers. The defendants will be referred to collectively as the defendants, unless otherwise indicated. Defendants Farmers Co-op, Titonka, Buffalo Center, FCS, West Bend, FCE, Bode Co-op, and Cylinder Co-op will be referred to collectively as the Grain Elevators.

On September 25, 1996, the Honorable Suzanne B. Conlon, United States District Court Judge for the Northern District of Illinois transferred *Gunderson* to the Northern District of Iowa. On October 3, 1996, the Honorable James H. Alesia, United States District Court Judge for the Northern District of Illinois, transferred *Hoover* to the Northern District of Iowa.

Defendants ADM and the Grain Elevators subsequently moved for dismissal of the Producers' claims on a number of grounds. On April 17, 1997, the court entered its ruling on defendants' motions to dismiss and found, *inter alia*, that the Producers' CEA fraud claims had not been pleaded with sufficient particularity. The court also concluded that it did not need to

consider at that time defendants' various challenges, pursuant to Federal Rule of Civil Procedure 12(b)(6), to the adequacy of other claims asserted by the Producers, because repleading of the fraud claims, either by amendment or by refiling, was necessary in both cases. The court therefore granted defendants' motions to dismiss in each case to the extent that it found the claims of fraud inadequately pleaded under Federal Rules of Civil Procedure 9(b) and 12(b)(6). The Producers were directed to file an amended complaint adequately pleading fraud pursuant to Federal Rule of Civil Procedure 9(b). The court further held that such an amended complaint might also rectify any inadequacies perceived in the pleading of other claims, and therefore the Producers would be permitted to replead each count.

On May 20, 1997, the court consolidated *Gunderson* and *Hoover*. On June 10, 1997, the Producers filed their First Amended Complaint in the consolidated case.[5] The First Amended Complaint contained fifteen claims.[6] Defendant ADM

---

er Fraud and Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 505/2(5), against ADM; Count VIII alleges a state-law claim for rescission or cancellation of the contracts on the ground of fraudulent misrepresentations; Count IX alleges a state-law claim for breach of fiduciary duty against ADM and CSA; Count X alleges a state-law claim for breach of fiduciary duty against the Grain Elevators; Count XI alleges a state-law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan, and CSA. Count XII alleges a state-law claim for breach of contract against the Grain Elevators. Count XIII alleges a state-law claim for negligence against the Grain Elevators.

5. All defendants named in the original complaint, except Cooperative Grain, were again named as defendants in the First Amended Complaint.

6. The First Amended Complaint contained the following fifteen claims: Counts I and II alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under 18 U.S.C. § 1962(c), by ADM, CSA, FAC–MARC, and Agri–Plan; Count III alleged a RICO violation, under 18 U.S.C. § 1962(c), by Titonka; Count IV alleged a RICO violation,

under 18 U.S.C. § 1962(c), by ADM; Count V alleged fraud in violation of § 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b, against ADM and CSA; Count VI alleged that the HTAs are illegal because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(c); Count VII sought declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)-(c) of the CEA, 7 U.S.C. §§ 6(a)-(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c (a)(10); Count VIII alleged a violation of the CEA, 7 U.S.C. § 6d, by the defendant grain elevators; Count IX alleged a violation of the CEA, 7 U.S.C. § 6o(1), by Titonka, FCE, Bode Co-op, Buffalo Center, West Bend, Cylinder Co-op, FCS and Farmer's Co-op; Count X alleges a state-law claim for recission of the HTA contracts against defendant Grain Elevators; Count XI alleges a state-law claim of breach of fiduciary duty against ADM, FAC–MARC, Agri–Plan, and CSA; Count XII alleges a state-law claim for breach of fiduciary duty against the defendant Grain Elevators; Count XIII alleges a state-law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan,

and the Grain Elevators again sought the dismissal of all claims asserted against them in the First Amended Complaint. Among the grounds for dismissal asserted by defendants was the argument that the Producers had again failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b). On March 31, 1998, the court entered its ruling on defendants' motions to dismiss and again found, *inter alia,* that the Producers' CEA fraud claims had not been pleaded with sufficient particularity. The court further concluded that it did not need to consider, at that time, defendants' remaining challenges, pursuant to Federal Rule of Civil Procedure 12(b)(6), to the adequacy of other claims asserted by the Producers, because repleading of the fraud claims, either by amendment or by refiling, was necessary in both cases. The court therefore again granted defendants' motions to dismiss in each case to the extent that it found the claims of fraud inadequately pleaded under Federal Rules of Civil Procedure 9(b) and 12(b)(6). The Producers were directed to file a second amended complaint adequately pleading fraud pursuant to Federal Rule of Civil Procedure 9(b).

On May 28, 1998, the Producers filed their Second Amended Complaint in the consolidated case.[7] The Second Amended Complaint asserts the following fifteen claims: Counts I and II allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), under 18 U.S.C. § 1962(c), by ADM, CSA, FAC–MARC, and Agri–Plan; Count III alleges a RICO violation, under 18 U.S.C. § 1962(c), by Titonka; Count IV alleges a RICO violation, under 18 U.S.C. § 1962(c), by ADM; Count V alleges fraud in violation of § 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b, against ADM and CSA; Count VI alleges that the HTAs are illegal

because they violate §§ 4(a) and 4(d) of the CEA, 7 U.S.C. §§ 6(a) and 6(c); Count VII seeks declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate §§ 4(a)-(c) of the CEA, 7 U.S.C. §§ 6(a)-(c), § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities Act of 1934, 15 U.S.C. § 78c (a)(10); Count VIII alleges a violation of the CEA, 7 U.S.C. § 6d, by the Grain Elevators; Count IX alleges a violation of the CEA, 7 U.S.C. § 6o(1), by Titonka, FCE, Bode Co-op, Buffalo Center, West Bend, Cylinder Co-op, FCS and Farmer's Co-op; Count X alleges a state-law claim for recission of the HTA contracts against defendant Grain Elevators; Count XI alleges a state-law claim of breach of fiduciary duty against ADM, FAC–MARC, Agri–Plan, and CSA; Count XII alleges a state-law claim for breach of fiduciary duty against the defendant Grain Elevators; Count XIII alleges a state-law claim of fraudulent misrepresentation against ADM, FAC–MARC, Agri–Plan, CSA and Titonka; Count XIV alleges a state-law claim for breach of contract against the defendant Grain Elevators; Count XV alleges a state-law claim for negligence against the defendant Grain Elevators.

Defendant Grain Elevators have again moved to dismiss all claims asserted against them in the Second Amended Complaint.

## II. FACTUAL BACKGROUND

The factual background for disposition of the pending motion to dismiss is based entirely on the factual allegations contained in the Second Amended Complaint. The Producers are grain producers. Defendant ADM is registered with the Commodity Futures Traders Commission

---

CSA and Titonka; Count XIV alleges a state-law claim for breach of contract against the defendant Grain Elevators; Count XV alleges a state-law claim for negligence against the defendant Grain Elevators.

7. All defendants named in the First Amended Complaint are again named as defendants in the Second Amended Complaint.

("CFTC") as a Futures Commissions Merchant ("FCM"). Defendant FAC–MARC is registered with the CFTC as a Commodity Trading Advisor ("CTA"). Defendants Agri–Plan and CSA are registered with the CFTC as Introducing Brokers ("IB"). Defendants Farmers Co-op, Titonka, Buffalo Center, FCS, West Bend, FCE, Bode Co-op, and Cylinder Co-op are all grain elevators.

The Producers aver that at some time prior to February 1993, the following entities and individuals entered into a conspiracy: ADM; FAC–MARC; Agri–Plan; FAC–MARC and Agri–Plan officers including Dennis Hofmeister, Perry Aalgaard, and Steve Logemann; CSA and its officers including Lee Amundson; A/C Trading 2000 and its general partners, James Gerlach, Alvin Fischbach and Chalmer Miller; A/C Trading Co. and its general partners, James Gerlach, and Chalmer Miller; Agro Systems Corporation; Brighton Commodities, Inc.; and, Titonka and its manager, Duane Toenges. The conspirators intended to evade the rules and regulations of the CFTC and the Chicago Board of Trade ("CBOT") through the marketing of the HTAs, and in doing so, achieve the objective of the conspiracy: control of grain merchandising in north central Iowa. The Producers allege that the conspirators intended to use the elevators to disseminate misrepresentations to farmers to entice them to enter into HTA contracts.

Toenges and Hofmeister touted and solicited HTA contracts to Titonka's members on the condition that they hire Hofmeister as a consultant. At some point prior to 1994, Hofmeister, on behalf of the alleged conspirators, distributed a form HTA contract to elevators and farmers located in north central Iowa. At approximately the same time, FAC–MARC, Agri–Plan and CSA began conducting HTA seminars in north central Iowa with the purpose of promoting grain elevators to commence writing HTA contracts. As a result of these promotions, defendant Grain Elevators each engaged a member of the alleged conspiracy who, in turn, then enticed that defendant Grain Elevator's members to use HTA contracts.

In addition to grain merchandising, Buffalo Center held itself out as a CTA and held itself out as an expert in grain marketing and the use of HTA contracts. In January 1993, Buffalo Center held a marketing meeting at the country club in Garner, Iowa. At the meeting, Dennis Alkire, on behalf of Buffalo Center, stated that: (a) the HTA contracts presented no risks; (b) roll fees were not paid until the crop was delivered; and (c) the HTA contracts could be rolled indefinitely. In referencing prior years' prices as examples, Aikens never used any year where the HTA contracts would have lost money. Henry Mayland stated that the farmers could sell amounts in excess of their anticipated annual crop and then "sell" their excess contracts to their neighbors. Ron Berschman attended a similar meeting held by Buffalo Center in March 1993, at which Alkire repeated the representations made at the January meeting.

On February 6, 1993, Daryl Cushman, Marvin and Ernest Heidecker all attended a seminar given by Aalgaard. At this seminar, Aalgaard represented that: (a) the HTA contracts offered a no risk method for hedging the price of grain; (b) the HTA contracts did not have a delivery date so there was no obligation to deliver upon them and the farmer could, instead, deliver on the cash market if the price on that market was better; (c) if the crop was smaller than projected, the shortage could be rolled forward; (d) without a delivery commitment, the farmer was free to hedge amounts of grain equivalent to one-hundred percent of the farmer's anticipated crop using HTA contracts; (e) all margin calls would be met by the elevator; and (f) the farmer could buy out the HTA contract at any time.

On July 8, 1993, Philip Asa, Keith Brandt and Dan Mueller all attended a seminar given by Hofmeister. At this

seminar, Hofmeister represented that: (a) with the HTA contracts the farmers could lock in "5 years' worth of prices;" (b) they would face a minimal risk of two to three cents per bushel and never more than ten cents per bushel; (c) that they could sell on the cash market if the cash price was higher than the HTA price; (d) the elevator would meet all margin calls; and (e) the farmer could buy out the HTA contract at any time. Hofmeister made similar representations in a seminar attended by plaintiff David Gerber. In February 1994, plaintiffs Gary and Janice Hoover attended a seminar at the Barn, a facility located outside of Titonka, Iowa, during which Hofmeister and Toenges made consistent representations regarding the benefits of HTA contracts.

In February 1994, Toenges met with plaintiffs Dan DeWaard, Rande Giesking, Bruce Kitzinger, Gary Hoover, and Jerry Dreesman at the Titonka elevator office. At this meeting, Toenges represented that: (a) the HTA contracts would take the risk out of farming; (b) the participants would be able to give their bankers "hard numbers" for the value of future crops; (c) as a result of the rolling feature of HTA contracts, participants could hedge their entire crop rather than only a percentage; and, (d) the farmer could buy out of the HTA contract at any time.

In May 1994, Mayland asked Shawn Thomsen to write HTA contracts. Mayland represented that the HTA contracts were risk-free, could be rolled indefinitely and that a farmer could sell amounts equivalent to one hundred percent of his anticipated production.

On June 29, 1994, Aalgaard and Logemann held a meeting at the Farmers Trust and Savings Bank in Buffalo Center. Aalgaard and Logemann made representations at this meeting regarding the benefits of HTA contracts consistent with those detailed above. Plaintiff Loucks attended this meeting. Following this meeting, plaintiff Johnson agreed to write HTA contracts. Logemann wrote HTA contracts

between John and Farmers Co-op with the assistance of Farmers Co-op's manager, Donald Goetz. Allegedly, Logemann falsely represented to Goetz that Johnson and other farmers doing business with Farmers Co-op would cease doing business there unless Goetz agreed to begin writing HTA contracts. As a result of Logemann's admonition, Goetz agreed to write HTA contracts.

On July 4, 1994, Lee Amundson, the President of CSA, held a meeting at the Clear Lake Best Western on behalf of ADM and Buffalo Center. Amundson represented that HTA contracts were safe and that HTA contracts: (a) enable the farmer to lock in a price for his or her contract; (b) provide unlimited rolling so that farmers could take advantage of higher cash prices for their crops; (c) were virtually risk free; and (d) could be bought out at any time. Clarence and Christian Miller were in attendance at this meeting.

In August 1994, Hofmeister met with the Jay Gunderson and repeated the representations regarding HTA contracts detailed above. In September 1994, Hofmeister met with the Harringtons and repeated the representations regarding HTA contracts. In September 1994, Hofmeister and Toenges met with Dan DeWaard, Duane DeWaard, his banker Dennis Ruecker, and Steve Heyer. At this meeting, Hofmeister and Toenges again repeated their representations regarding HTA contracts.

In December 1994, Ron Broderson met with Ray Beenken, West Bend's controller, at Beenken's office. Beenken stated that "the beauty" of the HTA program was that the farmer could deliver under the HTA contract or roll the HTA contract and deliver on the cash market if the cash price was higher, and the farmer could buy out the HTA contract at any time. Beenken represented that the HTA price was the "floor" price and that the price could only be improved by "capturing the carry" as the underlying futures hedge was rolled

forward. He told Broderson that the "only risk" to the farmer was if a farmer set his price objective too high so that it did not get filled. Beenken repeated these representations to Ed Noonan in December 1995.

On January 17, 1995, Buffalo Center sponsored a meeting at a church in Swea City, at which Mayland and Earl Cornelius made representations regarding HTA contracts. Buffalo Center sent invitations for this meeting to over 700 patrons. William Walstead was present at this meeting. Mayland repeated the representations he had previously made regarding HTA contracts at the meeting. In February 1995, Mayland held a meeting at Buffalo Center and again repeated the representations he had previously made regarding HTA contracts. Dale Meinders, John Oftedahl and Duane Davids were at this meeting.

On February 15, 1995, Hofmeister met with Ed and Jim Otis at the Days Inn in Clear lake, Iowa. Hofmeister repeated the representations regarding HTA contracts that he had made at other, earlier meetings. Similarly, in March 1995, Hofmeister met with Ron and Debbie Schmidt, on April 3, 1995, he met with Bob Becker and Bob Grim, on May 9, 1995, he met with Beverly Everett, and on June 28, 1995, he met with Denny and Mike Cink. On each of these occasions Hofmeister repeated the representations regarding HTA contracts that he had previously made.

On February 24, 1995, Hofmeister, Aalgard and Toenges held a second meeting at the Barn and repeated the representations regarding HTA contracts that had been made the preceding year. Dennis and Reginald Schutjer, Rich Gardner, and Steve Berschman attended the meeting at the Barn. In December 1993, Berschman had been told by Tom Myer that: (a) the elevator would pay all margins on the HTA contracts; (b) the HTA contracts could be rolled by the farmer at the farmer's discretion; and, (c) the HTA contracts could be rolled forward indefinitely. Hofmeister did not disclose that: (a) the HTA

contract "entailed an old crop/new crop spread" that held unlimited risk of loss; (b) a farmer who "set the basis" could not be guaranteed the price selected and was facing the risk of unlimited loss from the time he set the basis until the offsetting futures position was actually liquidated; (c) the farmer was running a credit risk; (d) an inverse market could be so severe that the farmer might never roll the position to a positive; and (e) he lacked any actual experience in writing multi-year HTA programs and had never "rolled" through an inverse market.

In February or March of 1995, Hofmeister, Aalgard and Toenges held a meeting in the basement of the Titonka elevator, and repeated the representations regarding HTA contracts that had been made in prior meetings. Jerry Giesking and Tom Lichter were present at this meeting. Following this meeting, Aalgaard met with Ray and Tom Lichter and Robert Arendt at Tom Litchter's place of business. Aalgaard again repeated the representations regarding HTA contracts that had been made in prior meetings.

In March 1995, Myer told Steve Shortenhaus that Buffalo Center would now permit farmers to roll contracts indefinitely and that Shortenhaus could write multiple year HTA contracts with no risks. Myer had previously, at different times, told Dale Kramersmeier, James Hofbauer, James Junkmeier, Harold and Karen Davids, Dale Koppen, Mark Hamilton, and Ron Ennen that HTA contracts were risk free, that the elevator would pay all margins, that the farmer could roll contracts indefinitely and that the farmer could deliver on the cash market or roll the HTA contract. Mayland made near identical representations to Bruce Meinders, Les Beekman, and Rick Hofbauer.

In December 1995, Jon Olson had a conversation with Mike Bierle at FCE regarding HTA contracts. Bierle told Olson that Olson Farms could hedge amounts equivalent to five years of crop through

HTA contracts which had unlimited rolling and which enabled the farmer to deliver on the cash market if the price was better or if production was below projections. Bierle stated that risk of HTA contracts was negligible. Laurence Doden also spoke to Bierle about entering into HTA contracts with FCE. Bierle told Doden that HTA contracts could be rolled indefinitely, that HTA contracts could be bought out, that the elevator would meet margin calls, and that Doden could deliver on the cash market if he desired.

Based on the representations detailed above regarding HTA contracts, the Producers began writing HTA contracts with the Grain Elevators. During each of the meetings identified above, the defendants failed to disclose that: (a) the Producers were undertaking a naked short position in the futures market for the commodity futures and/or commodity options contracts that the Grain Elevators would undertake in connection with the HTA contracts; (b) the Producers faced unlimited risk of loss; (c) the possibility of realizing losses increased directly with the amount of time the farmer would be required to roll the underlying futures positions; (d)the defendants intended to misrepresent to the CBOT that the nature of the underlying contracts; (e) the Grain Elevators secretly reserved certain rights; and (f) the HTA would lose value if the new crop grain prices failed to maintain their strength versus the old crop futures prices.

In the fall of 1995, Hofmeister and Toenges advised all Producers with HTA contracts with Titonka and FAC–MARC to "take advantage of the higher cash prices and roll the HTA contracts forward." In November 1995, Toenges told Bruce and David Kitzinger that once farmers had committed to multi-year HTA contracts, "we will control the basis" and that he would raise the basis ten cents on any farmer who decided to deliver grain against the HTA contract rather than rolling the HTA contract forward. Toenges declared to the Kitzingers that "there's not a damn thing the farmers can do about it."

## III. LEGAL ANALYSIS

### A. Standards For Motions To Dismiss

The present motion to dismiss involves the interrelationship of two sets of standards: the standards for dismissal for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), and the standards for pleading fraud with particularity stated in Federal Rule of Civil Procedure 9(b). This court has considered in some detail the standards applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) in a number of published decisions. *See, e.g., Adler v. I & M Rail Link, L.L.C.,* 13 F.Supp.2d 912, 917 (N.D.Iowa 1998); *Terra Indus., Inc. v. Commonwealth Ins. Co. of Am.,* 990 F.Supp. 679, 682 (N.D.Iowa 1997); *Leiberkneckt v. Bridgestone/Firestone, Inc.,* 980 F.Supp. 300, 302 (N.D.Iowa 1997); *North Cent. F.S., Inc. v. Brown,* 951 F.Supp. 1383, 1404 (N.D.Iowa 1996); *Powell v. Tordoff,* 911 F.Supp. 1184, 1188 (N.D.Iowa 1995); *Quality Refrigerated Servs., Inc. v. City of Spencer,* 908 F.Supp. 1471, 1489 (N.D.Iowa 1995); *Reynolds v. Condon,* 908 F.Supp. 1494, 1502 (N.D.Iowa 1995); *Dahl v. Kanawha Inv. Holding Co.,* 161 F.R.D. 673, 681 (N.D.Iowa 1995). Likewise, the court has previously reviewed the specific pleading requirements of Federal Rule of Civil Procedure 9(b) in several published decisions. *See, e.g., Brown v. North Cent. F.S., Inc.,* 987 F.Supp. 1150, 1155 (N.D.Iowa 1997); *Brown v. North Cent. F.S., Inc.,* 173 F.R.D. 658, 664 (N.D.Iowa 1997); *Brown,* 951 F.Supp. at 1404; *De Wit v. Firstar Corp.,* 879 F.Supp. 947, 970 (N.D.Iowa 1995); Indeed, in this case, the court reviewed these sets of standards in some detail in each of its prior two orders regarding defendant Grain Elevators' previous motions to dismiss. Because the court does not find that intervening decisions have altered these standards in any way, it

will not repeat the discussions of those standards here.

### B. CEA Fraud Claims

The Grain Elevators again assert that the Producers have failed to plead their fraud claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b), and, as a result, have failed to state a claim upon which relief can be granted. The Producers counter that the fraud allegations here are sufficient under the standards of Rule 9(b). Thus, the court must determine whether the Producers have pleaded their fraud based claims with sufficient particularity. The court will briefly review the requirements for pleading fraud under Rule 9(b) and will then turn to an analysis of the fraud based claims found in the Amended Complaint.

### 1. Pleading requirements of FED. R. CIV. P. 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure provides as follows:

> (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

FED. R. CIV. P. 9(b).

In *DeWit v. Firstar Corp.*, 879 F.Supp. 947, 989 (N.D.Iowa 1995), this court addressed the requirements for pleading fraud stated under Rule 9(b):

> Rule 9(b) clearly imposes obligations additional to those stated in *Fed. R.Civ.P.* 8, which establishes notice pleading. *In re GlenFed, Inc., Securities Litigation*, 42 F.3d 1541, 1547 (9th Cir.1994). The statement of the claim must also aver with particularity the circumstances constituting the fraud. *Id.* (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 615 (1990), which states that Rule 9(b) "is a special pleading requirement and not contrary to the

general approach of simplified pleading adopted by the federal rules...."). Rule 9(b) "would clearly be superfluous if its only function were to ensure that defendants are provided with that degree of notice which is already required by Rule 8(a)." *Id.*

> Rule 9(b) [specifically requires] "particularized allegations of the circumstances constituting fraud." *Id.; Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994) (Rule 9(b) "requires that 'the circumstances constituting fraud ... shall be stated with particularity' ")[, *cert. denied*, 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995)]. Under the rule, allegations of fraud in a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* (describing these as "time, place, and content" requirements); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995); *Mills [v. Polar Molecular Corp.]*, 12 F.3d [1170,] 1175 [(2d Cir.1993)] (citing *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). Scienter may, within limits, be pleaded in conclusory fashion. *Id.* However,

> general averments of the defendants' knowledge of material falsity will not suffice. Consistent with *Fed.R.Civ.P.* 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged.

> *Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 174 (1st Cir.1994) (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994)). The purpose of this pleading rule is to provide notice to the defendant so that it can provide an adequate answer. *Kaplan*, 49 F.3d at 1370.

*DeWit,* 879 F.Supp. at 989–90; *accord North Cent. F.S., Inc. v. Brown,* 951 F.Supp. 1383, 1407 (N.D.Iowa 1996) (*Brown I*)(quoting *DeWit,* 879 F.Supp. at 989–90).

This analysis of Rule 9(b)'s requirements is fully supported by precedent from the Eighth Circuit Court of Appeals and other federal courts of appeal. In *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.,* 61 F.3d 639 (8th Cir.1995), the Eighth Circuit Court of Appeals explained:

> Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." " 'Circumstances' include such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir.1985), conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule. *In re Flight Transp. Corp. Sec. Litig.,* 593 F.Supp. 612, 620 (D.Minn.1984).

*Commercial Property,* 61 F.3d at 644; *see Roberts v. Francis,* 128 F.3d 647, 651 (8th Cir.1997) (noting that factors a court should examine in determining whether the "circumstances" constituting fraud are stated with particularity under Rule 9(b) "include the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud."); *Murr Plumbing, Inc. v. Scherer Bros. Fin. Serv. Co.,* 48 F.3d 1066, 1069 (8th Cir.1995) (applying these standards

from Rule 9(b) to pleadings of mail and wire fraud); *Allison v. Security Ben. Life Ins. Co.,* 980 F.2d 1213, 1215 (8th Cir.1992) (holding that to satisfy Rule 9(b), allegations of fraud must state with particularity the critical elements of fraud under the governing law, which, under Arkansas law, included the actionable misrepresentations, how the defendant intended the plaintiff to act in reliance on each of the alleged misrepresentations, the nature of the plaintiffs' justifiable reliance on each misrepresentation, and the damage resulting from such reliance).

The First Circuit Court of Appeals has similarly explained that:

> Rule 9(b)'s relaxation of the scienter requirement is not intended to allow plaintiffs to 'base claims of fraud on speculation and conclusory allegations. Therefore, to serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent.' [*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) ] (citations and internal quotations omitted). A securities plaintiff must allege " 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading.' " *Serabian,* 24 F.3d at 361 (quoting *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir. 1992)). We impose this heightened requirement " 'even when the fraud relates to matters peculiarly within the knowledge of the opposing party.' " *Lucia,* 36 F.3d at 174 (quoting *Romani,* 929 F.2d at 878).

*Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997); *see also Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1019 (5th Cir.1996) (also holding, in another securities fraud case, that Rule 9(b) was not satisfied where " 'the complaint contains no assertions of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made,' " quoting *Tuchman v. DSC Com-*

*munications Corp.,* 14 F.3d 1061, 1069 (5th Cir.1994)).

A party pleading fraud is "limited to the specific allegations pleaded in [its] complaint." *McAnally v. Gildersleeve,* 16 F.3d 1493, 1496 (8th Cir.1994) (citing Rule 9(b) and *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir.1985)). Keeping these standards in mind, the court turns to consideration of the Producers' allegations of fraud contained in their Second Amended Complaint.

### 2. The pleading of fraud in Counts VI and IX

The Grain Elevators initially assert that the Producers' CEA fraud claims in Counts VI and IX are deficient because they are based on unsupported allegations of agency. Therefore, the court must ascertain whether the Producers have pleaded agency with sufficient specificity in each of these counts.

As this court previously observed in this case:

> A number of federal district courts have held that " '[a] complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusions of agency.' " *Williams v. Ford Motor Co.,* 990 F.Supp. 551, 554 (N.D.Ill.1997) (quoting *Connick v. Suzuki,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 592 (1996)); *accord Lachmund v. ADM Investor Servs., Inc.,* 26 F.Supp.2d 1107, 1114 (N.D.Ind.1998) (holding that legal conclusion that partner in business was the agent of another company was insufficient allegation of agency); *MJ & Partners Restaurant Ltd. Partnership v. Zadikoff,* 10 F.Supp.2d 922, 931 (N.D.Ill.1998) ("While the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss."); *Cohen v. Standard Bank Inv.*
> *Corp. Ltd.,* 1998 WL 782024, at *6 (S.D.N.Y. Nov.6, 1998) (holding that party alleging existence of agency relationship must plead sufficient facts to establish an agency relationship); *Allied Prods. Corp. v. Electric & Gas Tech., Inc.,* No. 97 C 5256, 1998 WL 173305, at *2 (N.D.Ill. Apr.8, 1998) ("Mere legal conclusions are insufficient to state a claim based on agency. Instead, a claimant must plead facts that would support a finding that the alleged agents had actual or apparent authority to act on behalf of another.") (citation omitted); *Balderos v. City Chevrolet, Buick & Geo, Inc.,* No. 97C2084, 1998 WL 155912, at *6–7, RICO Bus. Disp. Guide 9518 (N.D.Ill. Mar.31, 1998) (holding that pleading containing conclusory allegations of agency was insufficient); *Cumis Ins. Soc'y v. Peters,* 983 F.Supp. 787, 796 (N.D.Ill.1997) ("While the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss."); *Peterson v. H & R Block Tax Servs., Inc.,* 971 F.Supp. 1204, 1213 (N.D.Ill.1997) ("Although the trier of fact most often answers whether particular facts giving rise to an agency relationship exist, 'a plaintiff must still plead facts, which, if proved, could establish the existence of an agency relationship.' ")(quoting *Knapp v. Hill,* 276 Ill. App.3d 376, 212 Ill.Dec. 723, 657 N.E.2d 1068, 1071 (1995)); *Prochaska & Assocs. v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 798 F.Supp. 1427, 1432 (D.Neb.1992) (holding that "bald" allegation of agency "is by itself a mere legal conclusion and is therefore insufficient to withstand a motion to dismiss.").

*Gunderson v. ADM Investor Servs., Inc.,* 43 F.Supp.2d 1058, 1063 (N.D.Iowa 1999). This court went on to address when the pleading of allegations of agency must meet the requirements of Federal Rule of Civil Procedure 9(b):

The court notes that the pleading of allegations of agency must also meet the requirements of Federal Rule of Civil Procedure 9(b) where the allegations of fraud are based on a claim of agency. *See Kolbeck v. LIT Am., Inc.*, 923 F.Supp. 557, 569 (S.D.N.Y.1996), *aff'd*, 152 F.3d 918 (2d Cir.1998) (unpublished table opinion); *American Credit Indem. Co. v. HCG Fin. Servs., Inc.*, 1990 WL 77992, at *4 (N.D.Ill. June 1, 1990); *Pershing Div. of Donaldson, Lufkin & Jenrette Secs. Corp. v. Sirmer*, 1989 WL 165155, * 6–7 (N.D.Ill.Dec.27, 1989). As the court in *Kolbeck* explained:

> In a case involving multiple defendants, Rule 9(b) mandates that the complaint inform each defendant of his alleged role in the deception. Broad allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b). *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F.Supp. 608, 620–21 (S.D.N.Y.1990).

The requirement of precision applies equally when the goal is to hold defendants vicariously liable for the fraud of another and when the agency relationship itself allegedly is part of the fraud. When an implied agency relationship is allegedly part of the fraud, "the circumstances constituting the fraud" on the part of the purported principal include both the facts constituting the underlying fraud and the facts establishing the agency relationship.

*Gunderson*, 43 F.Supp.2d at 1064 (quoting *Kolbeck*, 923 F.Supp. at 569).

 Here, with the exception of Titonka, the complaint does not sufficiently allege the existence of an agency relationship between any of other the Grain Elevators and FAC–MARC or Agri–Plan.[8.] Although the Producers allege that FAC–MARC and Agri–Plan officers were "acting on behalf of" the Grain Elevators, *see* Second Amended Complaint at ¶¶ 58,59, 70, 73, 76, 79, 82–84, 87–92, 99, the Producers have failed to allege an act or authorized statement by any of the other Grain Elevators granting FAC–MARC or Agri–Plan authority which would permit them to

---

**8.** With respect to Titonka, the Producers allege that Titonka and its Manager, Toenges, entered into the charged conspiracy. Second Amended Compl. at ¶ 36(G). Specifically, the Producers claim that Hofmeister recruited Titonka and Toenges into the conspiracy. *Id.* at ¶ 54. In addition, the Producers claim that Toenges accompanied Hofmeister when the two solicited HTAs to Titonka members. *Id.* Specifically, the Second Amended Complaint contains allegations that in February 1994, Hofmeister and Toenges made representations regarding the benefits of HTA contracts during a seminar at the Barn. *Id.* at ¶¶ 64–66. It is alleged that Toenges failed to tell the attendees that Titonka had not submitted the HTA program to its lender to secure financing for the HTA program in an adverse year. *Id.* at ¶ 66. It is further alleged that in February 1994, Toenges met with plaintiffs Dan De-Waard, Rande Giesking, Bruce Kitzinger, Gary Hoover, and Jerry Dreesman at the Titonka elevator office. At this meeting, Toenges represented that: (a) the HTA contracts would take the risk out of farming; (b) the participants would be able to give their bank-

ers "hard numbers" for the value of future crops; (c) as a result of the rolling feature of HTA contracts, participants could hedge their entire crop rather than only a percentage; and, (d) the farmer could buy out the HTA contract at any time. *Id.* at ¶ 68. Toenges allegedly attended a number of other meetings at which he, or others he was holding the meeting with, made similar representations to groups of farmers in attendance. *Id.* at ¶¶ 77, 80, 81, 84, 93. It is also alleged that, in the fall of 1995, Hofmeister and Toenges advised all Producers with HTA contracts with Titonka and FAC–MARC to "take advantage of the higher cash prices and roll the HTA contracts forward." In November 1995, Toenges told Bruce and David Kitzinger that once farmers had committed to multi-year HTA contracts, "we will control the basis" and that he would raise the basis ten cents on any farmer who decided to deliver grain against the HTA contract rather than rolling the HTA contract forward. *Id.* at ¶ 96. Toenges allegedly declared to the Kitzingers that "there's not a damn thing the farmers can do about it." *Id.*

x

make statements or representations, on an elevator's behalf, regarding the HTAs. Specifically, the Producers have failed to allege that any of the other Grain Elevators bestowed actual authority on Aalgaard, Hofmeister, or Logemann to make representations or statements regarding the HTAs on their behalf. Similarly, the Producers have not alleged any acts on the part of the other Grain Elevators that would indicate to a third party that Aalgaard, Hofmeister, or Logemann had one of the other Grain Elevators' grant of authority to promote the HTAs.

The significance of the lack of an agency relationship between the other Grain Elevators and FAC–MARC or Agri–Plan is that, without such a relationship, the Producers have failed to make sufficient factual allegations of scienter on the part of the other Grain Elevators. In a prior order in this case, the court provided the Producers with the following instructions regarding the pleading of scienter:

> "general averments of the defendants' knowledge of material falsity will not suffice. Consistent with *Fed.R.Civ.P.* 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged."

Memorandum Opinion and Order of March 31, 1998 at pp. 14–15 (quoting *De Wit,* 879 F.Supp. at 989–90). The Producers have not identified which of the Grain Elevators' respective officers or agents knew that their statements were false or when these officers or agents first learned of the falsity of their statements.

Because the Second Amended Complaint fails to contain allegations that support the proposition that the Grain

Elevators, other than Titonka, granted Aalgaard, Hofmeister, or Logemann authority which would permit them to make statements or representations—on the Grain Elevators' behalf—regarding the HTAs, but instead rests on legal conclusions that Aalgaard, Hofmeister, or Logemann were agents of the Grain Elevators, the court concludes that the Second Amended Complaint fails to contain sufficient allegations of agency. Accordingly, this portion of the Grain Elevator's motion is granted as to Farmers Co-op, Buffalo Center, FCS, West Bend, FCE, Bode Co-op, and Cylinder Co-op, but denied as to Titonka.

### 3. *Dismissal with prejudice*

■ This court made clear in its prior decision that the Producers were being granted one final opportunity to attempt to plead fraud with particularity. This court rejects the notion that a party presenting deficient pleadings must automatically be given an opportunity to replead claims before the court dismisses their deficient claims outright. *See Brown,* 173 F.R.D. at 674; *Brown I,* 951 F.Supp. at 1409 (citing, *inter alia, DeWit v. Firstar Corp.,* 904 F.Supp. 1476, 1502–05 & n. 21 (N.D.Iowa 1995)). Certainly, nothing compels the court to allow any party four opportunities to try to make pleadings conform to Rule 9(b) or to rectify deficiencies previously identified by the court, even if other claims presented in the same complaint are viable. This time, therefore, the Producers' fraud claims will be dismissed with prejudice.

### C. *Count VI's Allegations Of Excessive Speculation*

In Count VI, the Producers assert the Grain Elevators violated Section 4a of the CEA, 7 U.S.C. § 6a, which prohibits a party from trading in excess of the speculative limits fixed by the CFTC.[9] The

**9.** Section 6a provides that:
a) Burden on interstate commerce; trading or position limits

> Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to

Grain Elevators assert that the Producers lack standing to bring such a claim under Section 22. Therefore, the issue before the court is whether there is a private right of action under the excessive speculation provisions found in 7 U.S.C. § 6a. Clearly, no private right of action is expressed in the statute. The Producers have not cited and the court has not found any case holding that a private right of action exists under the excessive speculation provision. At least two cases have held that a private right of action does not exist under that provision. *In re Soybean Futures Litigation,* 892 F.Supp. 1025, 1042 (N.D.Ill.1995); *Liang v. Hunt,* 477 F.Supp. 891, 891 (N.D.Ill.1979).

■ In the *In re Soybean Futures Litigation* case, the court made the following observations regarding this issue:

> Section [6a] itself does not define excessive speculation or set forth any speculative limits; rather, Congress directed the CFTC to set and enforce limits on the positions a party may hold and the amount of trading it may conduct, with exemptions available for bona fide hedging. 7 U.S.C. § 6a(a)-(c). Neither Section [6a] nor Section 22 authorize private

enforcement of CFTC regulations, nor have the courts been willing to recognize such a claim. *See Davis v. Coopers & Lybrand,* 787 F.Supp. 787, 799 (N.D.Ill. 1992) (dismissing claim because "the exclusive private remedy under CEA § 22 does not include a cause of action for violations of CFTC Regulations"); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co.,* 709 F.Supp. 815, 820 (N.D.Ill. 1989) (finding that "Congress did not intend that the rules promulgated by the CFTC should give rise to a private cause of action"). Moreover, Defendants assert that under this set of facts, Plaintiffs' claim of excessive speculation satisfies none of the four "transaction conditions" required to bring a claim under Section 22(a), 7 U.S.C. § 25(a)(1). The only possible condition of relevance is manipulation, *id.* § 25(a)(1)(D), yet if Plaintiffs are arguing that Defendants' alleged violation of the speculative limits caused prices to be manipulated or was part of a manipulative scheme, Plaintiffs are describing two components of the same claim, not bringing two separate claims under the CEA.

*In re Soybean Futures Litigation,* 892 F.Supp. at 1042. The court concurs and

the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity. For the purpose of diminishing, eliminating, or preventing such burden, the Commission shall, from time to time, after due notice and opportunity for hearing, by rule, regulation, or order, proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market as the Commission finds are necessary to diminish, eliminate, or prevent such burden. In determining whether any person has exceeded such limits, the positions held and trading done by any persons directly or indirectly controlled by such person shall be included with the positions held and trading done by such person; and further, such limits upon positions and trading shall apply to positions held by, and trading done by,

two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single person. Nothing in this section shall be construed to prohibit the Commission from fixing different trading or position limits for different commodities, markets, futures, or delivery months, or for different number of days remaining until the last day of trading in a contract, or different trading limits for buying and selling operations, or different limits for the purposes of paragraphs (1) and (2) of subsection (b) of this section, or from exempting transactions normally known to the trade as "spreads" or "straddles" or "arbitrage" or from fixing limits applying to such transactions or positions different from limits fixed for other transactions or positions. The word "arbitrage" in domestic markets shall be defined to mean the same as a "spread" or "straddle". The Commission is authorized to define the term "international arbitrage".

7 U.S.C. § 6a.

concludes that no private cause of action exists under the excessive speculation provisions found in 7 U.S.C. § 6a. Therefore, this portion of the Grain Elevators' motion is granted.

### D. Count VIII's Failure–To–Register Allegations

The Grain Elevators also seek dismissal of Count VIII of the Second Amended Complaint. In Count VIII, the Producers allege that the Grain Elevators violated 7 U.S.C. § 6d by failing to register as FCM's with the CFTA.[10] The Producers seek to enforce this provision pursuant to 7 U.S.C. § 25. The Grain Elevators contend that Count VIII must be dismissed because the Producers have failed to plead loss causation.

It must be remembered that the rules of pleading under the Federal Rules of Civil Procedure are liberal. *See Schmedding v. Tnemec Co., Inc.*, 187 F.3d 862, 865 (8th Cir.1999); *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 316 (8th Cir.1997), *cert. denied sub nom. NationsMart v. Carlon*, 524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998); *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 658 (8th Cir.1995). Federal Rule 8(a)(2) requires a plaintiff to plead only "a short and plain statement of the

---

**10.** Section 6d provides that:

It shall be unlawful for any person to engage as futures commission merchant or introducing broker in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless—

(1) such person shall have registered, under this chapter, with the Commission as such futures commission merchant or introducing broker and such registration shall not have expired nor been suspended nor revoked; and

(2) such person shall, if a futures commission merchant, whether a member or nonmember of a contract market, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held: Provided, however, That such money, securities, and property of the customers of such futures commission merchant may, for convenience, be commingled and deposited in the same account or accounts with any bank or trust company or with the clearinghouse organization of such contract market, and that such share thereof as in the normal course of business shall be necessary to margin, guarantee, secure, transfer, adjust, or settle the contracts or trades of such customers, or resulting market positions, with the clearinghouse organization of such contract market or with any member of such contract market, may be withdrawn and applied to such purposes, including the payment of commissions, brokerage, interest, taxes, storage, and other charges, lawfully accruing in connection with such contracts and trades: Provided further, That in accordance with such terms and conditions as the Commission may prescribe by rule, regulation, or order, such money, securities, and property of the customers of such futures commission merchant may be commingled and deposited as provided in this section with any other money, securities, and property received by such futures commission merchant and required by the Commission to be separately accounted for and treated and dealt with as belonging to the customers of such futures commission merchant: Provided further, That such money may be invested in obligations of the United States, in general obligations of any State or of any political subdivision thereof, and in obligations fully guaranteed as to principal and interest by the United States, such investments to be made in accordance with such rules and regulations and subject to such conditions as the Commission may prescribe.

It shall be unlawful for any person, including but not limited to any clearing agency of a contract market and any depository, that has received any money, securities, or property for deposit in a separate account as provided in paragraph (2) of this section, to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant.

7 U.S.C. § 6d.

claim showing that the pleader is entitled to relief...." *See Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts on which he bases his claim."). As the Eighth Circuit Court of Appeals has instructed: "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Hopkins v. Saunders,* 199 F.3d 968, 973 (8th Cir.1999) (quoting *Redland Ins. Co. v. Shelter Gen. Ins. Cos.,* 121 F.3d 443, 446 (8th Cir.1997)).

■ Here, the court notes that the Producers aver that "[a]s a result of the Defendant elevators' violations of 7 U.S.C. § 1, *et seq.,* and the rules and regulations promulgated thereunder, Plaintiffs suffered financial loss and injury." Second Amended Compl. at ¶ 206. These factual allegations are sufficient, albeit perhaps marginally so, to satisfy the liberal pleading requirements of the federal rules with regard to causation.[11] Therefore, this por-

11. Although the Grain Elevators take the Producers to task for their argument, contained in the Producers' brief, that causation may be established by their but for assertion that the Producers never would have written HTAs with the Grain Elevators if they had known that the Grain Producers were not in compliance with the CEA's registration requirements, such an argument is not the proper subject of motion to dismiss here because the allegations upon which this argument is premised are not contained within the complaint. Therefore, resolution of this argument must await a motion for summary judgment.

12. Section 6o provides that:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

tion of the Grain Elevators' motion is denied.

### E. Count XI–Commodity Trading Advisors Allegations

In Count XI, the Producers assert that the Grain Elevators violated the CEA prohibition on fraud and misrepresentation by "commodity trading advisors, commodity pool operators, and associated persons."[12] 7 U.S.C. § 6o. The Grain Elevators seek dismissal of Count XI on the ground that the Producers have failed to adequately plead facts establishing that the Grain Elevators were "commodity trading advisors" under the CEA. The CEA defines "commodity trading advisor" as any person who:

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writing, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

(2) It shall be unlawful for any commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator registered under this chapter to represent or imply in any manner whatsoever that such person has been sponsored, recommended, or approved, or that such person's abilities or qualifications have in any respect been passed upon, by the United States or any agency or officer thereof. This section shall not be construed to prohibit a statement that a person is registered under this chapter as a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, if such statement is true in fact and if the effect of such registration is not misrepresented.

7 U.S.C. § 6o.

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

7 U.S.C. § 1a(5)(A).[13]

In response to the Grain Elevators' assertion, the Producers direct the court's attention to paragraph 208 of the Second Amended Complaint in which they plead the following facts:

208. Titonka, Woden, Bode, Buffalo Center, West Bend, Cylinder, Ledyard and Wesley acted as commodity trading advisors within the meaning of 7 U.S.C. § 1a(5) and provided recommendations for the purchase and sale of commodity futures contracts and/or options for compensation, *i.e.* the initial HTA fees and HTA roll fees, which were not merely incidental to the operation of the business of the Defendant elevators.

Second Amended Compl. at ¶ 208.

■ Thus, the issue is whether these pleadings sufficiently state facts establishing that the Grain Elevators were "commodity trading advisors" under the CEA, within the purport of Rule 12(b)(6). As the court pointed out above, all well-pleaded factual allegations are assumed true and are viewed in the light most favorable to the Producers, *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d

209 (1986), and a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. The court concludes that the allegations contained in the Second Amended Complaint are sufficient to state a claim that the Grain Elevators were CTAs under the CEA. The Grain Elevators counter that, even if this is true, Count XI must be dismissed because the Producers' actions were based solely on their own experiences in the farming market and not on advice provided by the Grain Elevators. *See Procter & Gamble Co. v. Bankers Trust Co.,* 925 F.Supp. 1270, 1287 (S.D.Ohio 1996). This argument, however, ignores the requirement that the court must view all well-pleaded factual allegations in the light most favorable to the Producers. While this argument may well form the basis for dismissing this count on summary judgement, it does not provide a ground for dismissal on a motion to dismiss. Therefore, this portion of the Grain Elevators' Motion To Dismiss is denied.

### F. Counts VI, VII, VIII And IX– Allegations Of Futures Contracts

The Producers' claims in Counts VI, VII, VIII, and IX are all premised on the assertion that the HTAs are "off-exchange futures contracts or trade options in violation of 7 U.S.C. § 6(a) and/or 6c(b)." Sec-

---

13. Exceptions to this definition are found in 7 U.S.C. § 1a(5)(B), which provides that:

Subject to subparagraph (C), the term "commodity trading advisor" does not include—
(i) any bank or trust company or any person acting as an employee thereof;
(ii) any news reporter, news columnist, or news editor of the print or electronic media, or any lawyer, accountant, or teacher;
(iii) any floor broker or futures commission merchant;
(iv) the publisher or producer of any print or electronic data of general and regular dissemination, including its employees;
(v) the fiduciary of any defined benefit plan that is subject to the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 *et seq.*);
(vi) any contract market; and
(vii) such other persons not within the intent of this paragraph as the Commission may specify by rule, regulation, or order. 7 U.S.C. § 1a(5)(B). Section 1a(5)(C) provides that: "Subparagraph (B) shall apply only if the furnishing of such services by persons referred to in subparagraph (B) is solely incidental to the conduct of their business or profession." 7 U.S.C. § 1a(5)(C).

ond Amended Compl. at ¶ 195. The Grain Elevators contend in their motion that the Producers cannot state a cause of action under the CEA because the HTAs at issue in this litigation are not "off-exchange futures contracts." Instead, the Grain Elevators assert that the HTAs are contracts for deferred delivery and therefore not governed by the CEA. *See Grain Land Coop. v. Kar Kim Farms, Inc.*, 199 F.3d 983, 992 (8th Cir.1999) ("the CEA excludes from its reach 'any sale of any cash commodity for deferred shipment or delivery.'") (quoting 7 U.S.C. § 1a(11)). In response, the Producers assert that the deferred delivery contract defense raised by the Grain Elevators constitutes an affirmative defense under the CEA and, as a result, is not a proper subject for a motion to dismiss. The Producers alternatively contend that the question of whether the HTAs at issue in this litigation are illegal, off-exchange futures contracts or legal, deferred delivery contracts is a fact question that is also inappropriate for resolution on a motion to dismiss.[14] The court will address the Producers' later argument first.

The Eighth Circuit Court of Appeals recently provided the following guidance on determining whether a transaction constitutes an unregulated cash-forward contract:

> [I]t is the contemplation of physical delivery of the subject commodity that is the hallmark of an unregulated cash-forward contract. In order to determine whether a transaction is an unregulated cash-forward contract, we must decide "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Andersons*, 166 F.3d at 318; *see also Lachmund*, 191 F.3d at 787–88; *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772–73 (9th Cir.1995); *Oeltjenbrun v. CSA Investors, Inc.*, 3 F.Supp.2d 1024, 1039–40 (N.D.Iowa 1998).

Courts engaged in this inquiry have shunned self-serving labels attached to the contracts in question, and instead examined the intentions of the parties, the terms of the contract, the course of dealing between the parties, and any other relevant factors to determine whether the parties contemplated physical delivery. This individualized, multifactor approach scrutinizes each transaction for such characteristics as whether the parties are in the business of obtaining or producing the subject commodity; whether they are capable of delivering or receiving the commodity in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing the delivery obligation to be rolled indefinitely; whether payment takes place only upon delivery; and whether the contract's terms are individualized, rather than standardized. *See Lachmund*, 191 F.3d at 787; *Andersons*, 166 F.3d at 320; *Co Petro*, 680 F.2d at

---

**14.** The Eighth Circuit Court of Appeals has noted the Fourth Circuit Court of Appeals' explanation for the distinction:

> "Because the [CEA] was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate 'spot' transactions (transactions for the immediate sale and delivery of a commodity) or 'cash forward' transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred) .... Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity 'for future delivery' but excluded transactions involving 'any sale of any cash commodity for deferred shipment or delivery.'"

*Grain Land Coop.*, 199 F.3d at 991 n. 5 (*Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970–71 (4th Cir.1993) (citations and footnote omitted)).

578–79. We believe that this approach, which the district court applied to Obermeyer's contracts, *see In re Grain Land Coop Cases*, 978 F.Supp. at 1273–74, is the appropriate method to determine whether a contract contemplates actual delivery, and thus the best means of identifying those transactions which Congress sought to regulate through the CEA.

*Grain Land Coop.,* 199 F.3d at 990–91.

■ The court recognizes that the Producers have attached a number of the HTAs to their Second Amended Complaint and therefore the text of most of the HTAs involved in this litigation is currently before the court. Nonetheless, because this inquiry requires the court to examine, *inter alia,* "the intentions of the parties" and determine "whether the parties contemplated physical delivery," *Grain Land Coop.,* 199 F.3d at 991, the court concludes that the question of whether the HTAs are futures contracts or cash forward contracts is a fact intensive issue that precludes determination on a motion to dismiss.[15] Rather, the court concludes that such an assessment here may only be made, if at all, on a motion for summary judgment.[16] Therefore, this aspect of the Grain Elevators' Motion To Dismiss is denied.[17]

### G. Claims For Punitive Damages

■ The Grain Elevators also seek dismissal of the Producers' claims for punitive

damages under the CEA pursuant to 7 U.S.C. § 25(a)(3) on the ground that the Producers have not alleged CEA violations on the part of the Grain Elevators which arose "in the execution of an order on the floor" of a contract market.[18] Section 25(a)(3)(B) states in pertinent part:

> In any action arising from a violation in the execution of an order on the floor of a contract market, the person referred to in paragraph (1) shall be liable for ... where the violation is willful and intentional, punitive or exemplary damages equal to no more than two times the amount of such actual damages.

7 U.S.C. § 25(a)(3). The Producers do not resist this portion of the Grain Elevators' motion. Because the Producers have not asserted that any of the Grain Elevators willfully and intentionally committed violations of the CEA arising from the execution of an order on the floor of a contract market, this portion of the Grain Elevators' motion is granted and the Producers' claims for punitive damages under 7 U.S.C. § 25(3)(b) are dismissed.

### H. RICO Claims

The only RICO claim that pertains to any of the Grain Elevators is located in Count III of the Second Amended Complaint and that claim seeks relief only against Titonka. Titonka seeks dismissal of Count III on two grounds: first, that the Producers have failed to plead fraud

---

15. The court notes that the Second Amended Complaint contains allegations that delivery was not required under the HTAs. Second Amended Compl. at ¶¶ 58, 60, 64, 68, 73, 73, 76, 77, 80, 84, 87, 88, 89, 91, 92.

16. The Grain Elevators reliance on the unpublished district court decision in *Bunker v. Farmers Elevator Co. of Hopkins,* No. 97–0137–CV–W–SOW (W.D.Mo. Sept. 18, 1997), is misplaced. The *Bunker* decision did not involve a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), but a motion for summary judgment for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Bunker,* No. 97–0137–CV–W–SOW, at 2.

17. Although the court has denied this portion of the Grain Elevators' motion to dismiss, in light of the Eighth Circuit Court of Appeals' recent decision in *Grain Land Coop.,* the court has grave doubts regarding the viability of the Producers' CEA claims. Nevertheless, as the parties pursue discovery in this matter, the court urges the Producers' to reevaluate the viability of their CEA claims in light of the *Grain Land Coop.* decision.

18. The Second Amended Complaint incorrectly lists the CEA provision as being 7 U.S.C. § 25(3)(b). It is uncontested that the correct CEA provision is found in 7 U.S.C. § 25(a)(3).

with the particularity required by Rule 9(b); and second, that the Producers have failed to meet any of three requirements for a RICO violation.[19] The court will take up each of these arguments *seriatim.*

### 1. Pleading fraud with particularity

■ Courts have held that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to allegations of fraud in a civil RICO complaint. *See Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 783 (7th Cir.1999); *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 726 (7th Cir.1998); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.,* 927 F.2d 988, 992 (7th Cir.1991). Therefore, "the complaint must be specific with respect to the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Lachmund,* 191 F.3d at 783; *see Graue Mill,* 927 F.2d at 992–93. As discussed above, *see* section II(B)(2), the court concludes that the Producers have pleaded fraud with particularity against Titonka. Therefore, this portion of the Grain Elevators' motion is denied.

### 2. Pleading of elements of RICO

This court has previously considered in some detail the purpose and scope of RICO. *See generally Reynolds v. Condon,* 908 F.Supp. 1494, 1506–07 (N.D.Iowa 1995); *De Wit v. Firstar Corp.,* 879 F.Supp. 947, 960–62 (N.D.Iowa 1995). Thus, the court will not repeat that discussion here. The Producers allege that Titonka violated 18 U.S.C. § 1962(c), which is the provision of RICO that makes it "unlawful for any person ... associated with an enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c); *see Bowman v. Western Auto Supply Co.,* 985 F.2d 383, 384 n. 1 (8th Cir.), *cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993); *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 768 (8th Cir.1992); *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 990 (8th Cir. 1989). This court previously made the following observations regarding what a plaintiff must demonstrate in order to establish a RICO violation under § 18 U.S.C. § 1962(c):

" '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity that must include at least two racketeering acts.' " *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285; *United States v. Nabors,* 45 F.3d 238, 239 (8th Cir. 1995) (quoting *Sedima* for the elements of the violation in a criminal RICO prosecution); *Nolte v. Pearson,* 994 F.2d 1311, 1316–17 (8th Cir.1993); *Bowman,* 985 F.2d at 385 (quoting *Sedima*); *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 n. 4 (8th Cir.1991); *Granite Falls Bank,* 924 F.2d at 153; *Atlas Pile Driving Co.,* 886 F.2d at 990; and *compare United States v. Bennett,* 44 F.3d 1364, 1373 (8th Cir. 1995) (another criminal RICO prosecution in which the court stated that "[t]o prove a substantive RICO violation, the government must establish: 1) the existence of an enterprise affecting interstate or foreign commerce; 2) the defendant's association with the enterprise; 3) that the defendant participated in the conduct of the enterprise's affairs; and 4) that the defendant's participation was through a pattern of racketeering activity," citing *United States v. Sinito,* 723

---

**19.** The Grain Elevators have misconstrued or misread this court's decision in *Reynolds v. Condon,* 908 F.Supp. 1494, 1508 (N.D.Iowa 1995), to stand for the proposition that a plaintiff in a RICO action brought pursuant to 18 U.S.C. § 1962(c) is only required to prove

three elements. However, as detailed below, this court in *Condon* clearly held that there were four elements for a RICO claim brought under 18 U.S.C. § 1962(c). *Condon,* 908 F.Supp. at 1508.

F.2d 1250, 1260 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984), and *United States v. Phillips,* 664 F.2d 971, 1011 (5th Cir. 1981), *cert. denied sub nom. Meinster v. United States,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982)). The court in *Sedima* concluded that

> the statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Sedima,* 473 U.S. at 496–97, 105 S.Ct. at 3285–86 (footnotes omitted); *Bowman,* 985 F.2d at 385 (quoting *Sedima).* The Eighth Circuit Court of Appeals describes this as a "proximate cause" requirement that the injury asserted be proximately caused by the predicate acts alleged. *Bowman,* 985 F.2d at 387 (citing *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992), and *Schiffels v. Kemper Fin. Serv.,* 978 F.2d 344, 351 (7th Cir.1992)).

*Condon,* 908 F.Supp. at 1507–08; *see Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir.1997) ("A plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."). The court therefore turns next to examination of the Producers' allegations of each of these elements by Titonka in this case.

#### a. *Conduct of the enterprise*

The Grain Elevators initially assert that the Producers have failed to plead the "conduct" element of a RICO violation. Regarding the element of conduct, the Eighth Circuit Court of Appeals has instructed that:

> Liability under § 1962(c) extends only to those persons associated with or employed by an enterprise who "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

*Handeen,* 112 F.3d at 1347.

In *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the United States Supreme Court provided the following clarification regarding the scope of the operation or management test:

> An enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.
>
> \* \* \* \* \* \*
>
> [Section] 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the "enterprise's affairs," not just their own affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of its affairs—that is, participate in the operation or management of the enterprise itself....

*Id.* at 184–85, 113 S.Ct. 1163 (emphasis in original) (footnote omitted). Thus, "[t]he polestar is the activity in question, not the defendant's status." *Handeen,* 112 F.3d at 1349.

Here, taking the factual allegations found in the Second Amended Complaint in its most favorable light possible, the court must read the allegations contained in that pleading as demonstrating that Toenges and Titonka participated di-

rectly or indirectly in the conduct of the alleged enterprises' affairs. Specifically, the Second Amended Complaint contains allegations that Toenges and Titonka "took over" the financial decisions made on the farms regarding the HTAs. Second Amended Compl. at ¶ 178. In sum, though sparse in supporting facts, the court concludes that the Producers' allegations are sufficient to survive a motion to dismiss.

### b. RICO Enterprise

Next, the Grain Elevators assert that the Producers have improperly pleaded the farms as RICO enterprises. Clearly, the Producers have identified as an enterprise each of the farming operations of those Producers who wrote HTAs with or through Titonka. Second Amended Compl. at ¶ 171. Therefore, the question is whether these farming operations can constitute proper RICO enterprises. In *Condon*, this court explained in detail this particular requirement of RICO:

> The decisions of the Eighth Circuit Court of Appeals consistently define a RICO enterprise as exhibiting three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. *Nabors*, 45 F.3d at 240 (quoting *Atlas Pile Driving Co.*, 886 F.2d at 995); *Diamonds Plus, Inc.*, 960 F.2d at 770–71 (also quoting *Atlas Pile Driving Co.*, 886 F.2d at 995. The first characteristic, common or shared purpose, has apparently troubled the courts little, while the second, continuity of structure and personnel, has been of less certain meaning. *De Wit*, 879 F.Supp. at 966. The Eighth Circuit Court of Appeals has held that "continuity" does not require that members remain consistent. *Nabors*, 45 F.3d at 240. "Indeed, this circuit's definition of an enterprise specifically includes the phrase 'some continuity ... of personnel' (emphasis supplied), *Atlas Pile Driving Co.*, 886 F.2d at 995, not

'complete continuity.'" *Id.* The third characteristic, distinct structure, has required the most clarification. *De Wit*, 879 F.Supp. at 967. The Eighth Circuit Court of Appeals has defined the meaning of this characteristic as follows:

> Th[e] distinct structure might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure as is the hierarchy, planning, and division of profits within a prostitution ring.

*Diamonds Plus, Inc.*, 960 F.2d at 770 (quoting *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied sub nom. Phillips v. United States*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982)). Thus, the "focus of the inquiry" on this characteristic is "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." *Id.*

*Condon*, 908 F.Supp. at 1509.

▇▇▇ Here, the court concludes that the farms appear to exist separate and apart from the pattern of racketeering, and have as their shared or common purpose, the production and sale of crops. Moreover, these farming operations involved at least some continuity of personnel. Therefore, the court finds that the Producers have adequately pled a RICO enterprise.

### c. Pattern of racketeering activity

The Grain Elevators next contend that the Producers have failed to allege a pattern of racketeering activity. Liability under RICO is premised upon conduct involving a "pattern" of racketeering activity. 18 U.S.C. § 1962; *Manion v. Freund*, 967 F.2d 1183, 1185 (8th Cir.1992). Indeed, allegations regarding a "pattern of racketeering" have been described as "the heart of any RICO complaint." *Agency Holding Corp. v. Malley–Duff & Assocs.*,

*Inc.,* 483 U.S. 143, 154, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Granite Falls Bank v. Henrikson,* 924 F.2d 150, 154 (8th Cir. 1991) (quoting *Malley–Duff*). This pattern requirement is the primary source of RICO's unique character. *Granite Falls Bank,* 924 F.2d at 153.

Under RICO, a pattern of racketeering activity requires at least two predicate acts of racketeering activity, the last of which occurred within ten years of a predicate act previously committed by the defendant enterprise. 18 U.S.C. § 1961(5); *Manion,* 967 F.2d at 1185; *Diamonds Plus, Inc.,* 960 F.2d at 769.[20] Courts have noted that a RICO "pattern" has two characteristics, "relatedness" and "continuity." *Manion,* 967 F.2d at 1185–86; *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991). Predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. 3275. Continuity requires proof of "related predicates extending over a substantial period of time" or "involving a specific threat of repetition extending indefinitely into the future." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 242, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (proof that predicate acts are "part of an ongoing entity's regular way of doing business" may suffice to meet "continuity" requirement).

The "at least two acts of racketeering activity" requirement found in § 1961(5) "is only a minimum requirement," and two might not be enough. *Diamonds Plus, Inc.,* 960 F.2d at 769 (citing *H.J. Inc.,* 492 U.S. at 238, 109 S.Ct. 2893). The requirements that the acts be related and amount to or pose a threat of continued criminal

activity are also essential. *Id.* The Eighth Circuit Court of Appeals has noted that "[u]ltimately, the existence of a pattern is a question of fact." *Id.* (citing *Terry A. Lambert Plumbing,* 934 F.2d at 980).

Here, the Grain Elevators contend that the Producers' pleadings fail to meet the continuity requirement. The continuity requirement involves primarily the court's examination of the length of time during which the conduct occurred. *Terry A. Lambert Plumbing,* 934 F.2d at 980; *Atlas Pile Driving Co.,* 886 F.2d at 994. The Eighth Circuit Court of Appeals has declined to determine what period of time is needed to establish continuity. *Terry A. Lambert Plumbing,* 934 F.2d at 980. Instead, the court has held that a period of "over three years" was sufficient, *Atlas Pile Driving Co.,* 886 F.2d at 994, but a single transaction, with only one victim, taking place over a short period of time fails to rise to the level of a "pattern of racketeering" sufficient to sustain a RICO claim. *Terry A. Lambert Plumbing,* 934 F.2d at 981. However, the Eighth Circuit Court of Appeals has recognized that a period of seven months may be sufficient, if the plaintiff can demonstrate the predicate acts constitute more than "sporadic crime." *Nabors,* 45 F.3d at 241. Thus, the "continuity" requirement is temporal, requiring " 'a series of related predicates extending over a substantial period of time.' " *Manion,* 967 F.2d at 1185–86 (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893).

■■■ In *Lange v. Hocker,* 940 F.2d 359 (8th Cir.1991), the Eighth Circuit Court of Appeals held that

> continuity can be shown in one of two ways—closed-ended continuity or open-ended continuity. "A party alleging a RICO violation may demonstrate conti-

---

**20.** Section 1961(5) contains the following definition of "pattern of racketeering activity," (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of

which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5).

nuity over a closed period by proving a series of related predicates extending over a substantial period of time." [*H.J. Inc.*, 492 U.S.] at 242, 109 S.Ct. at 2902. Where continuity cannot be established in such a manner, a RICO violation may be shown when a *"threat* of continuity is demonstrated." *Id.* (emphasis in original).

*Lange*, 940 F.2d at 361. Thus, in *Lange*, the court found that the plaintiff had failed to allege closed–ended continuity, by asserting predicate acts committed only within a few weeks of each other, while the plaintiff had failed to prove open-ended continuity, because the RICO defendants were no longer in a position with the alleged RICO enterprise to play a management role, precluding any "threat of continuity." *Id.* at 361–62; *see also Thornton v. First State Bank of Joplin*, 4 F.3d 650, 652 (8th Cir.1993) ("While 'continuity' is both a closed– and open–ended concept," there is no continued criminal activity or threat of continued criminal activity from "predicate acts extending over a few weeks or months and threatening no future criminal conduct," quoting *H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. at 2902); *McDonald v. Schencker*, 18 F.3d 491, 497 (7th Cir.1994) (continuity is both a closed–and open–ended concept, citing factors for determining whether a closed period of predicate acts is sufficient to meet the continuity requirement). Thus, where, as here, the Producers have alleged predicate acts during a period of just over two years, from February, 1994 through May 26, 1996, the lengthy pattern of predicate acts alone "amounts to" continued criminal activity. *Diamonds Plus, Inc.*, 960 F.2d at 769 (stating continuity requirements in the alternative as conduct amounting to or threatening continued criminal activity); *Lange*, 940 F.2d at 361 (treating continuity requirement as provable in either of two ways: either by proving a closed-ended pattern of sufficient substance to amount to continued criminal activity, or by proving an open–ended pattern that poses a "threat of continuity"). If the misconduct

has been sufficiently long–lived, and involved sufficient and sufficiently–related acts to constitute a pattern of, not just sporadic, criminal conduct, it meets the requirements of the statute. *H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. 2893. The court concludes that allegations of predicate acts here, stretching from February, 1994 through May 26, 1996, are pleaded with sufficient specificity to meet the pattern of racketeering activity requirements of RICO, at least to the extent necessary to defeat a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Therefore, this portion of the Grain Elevators' motion is denied.

### I. State Law Claims

The Grain Elevators have also moved to dismiss the Producers' state law claims against them. The court will consider each of the Producers' state law claims in turn.

### 1. Rescission

The Grain Elevators initially attack Count X, the Producers' claim for rescission. The Grain Elevators contend that the Producers are in default with respect to the HTAs and that the Producers cannot claim that the legal remedies available to them are inadequate.

Here, however, the Producers contend that their claim for rescission is not based on Iowa common law, but under the Declaratory Judgement Act and point to this court's decision in *Brown*, 987 F.Supp. at 1150. In *Brown*, this court observed that:

> The court finds no authority under the CEA for the "alternative" relief of rescission the Producers seek in their CEA fraud claim in Count II. Again, the statutory provision authorizing private causes of action for violations of the CEA authorizes such actions only "for actual damages." 7 U.S.C. § 25(a). Thus, if the "alternative" relief of rescission of the HTAs is available as the

result of a finding that the contracts are within the purview of the CEA and a further finding that they are illegal owing to fraud in violation of § 4b of the CEA, 7 U.S.C. § 6b, that relief must come from some source other than the CEA.

Without properly identifying the basis for such an argument, the Producers seem to suggest that rescission is authorized as relief in light of the declaration of rights sought in Count II. Congress has provided for declaratory judgments by the federal courts through two provisions of the Declaratory Judgment Act, which state, in pertinent part, the following:

§ 2201. Creation of remedy

(a) In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

 * * * * * *

§ 2202. Further relief

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. §§ 2201(a), 2202 (emphasis added). The first provision of the Declaratory Judgment Act, § 2201, provides for the specific declaratory relief the Producers seek in Count II. Furthermore, § 2202 provides for the further, not "alternative," relief of rescission that might be appropriate as a result of the requested declarations. Thus, dismissal of Count II is not appropriate on the ground that rescission is not an available remedy under the CEA, because that relief is available under the Declaratory Judgment Act.

*Brown,* 951 F.Supp. at 1405.

Even if the court were to conclude that the Producers are seeking rescission under the CEA, this conclusion would not be dispositive here. The First Circuit Court of Appeals has observed that

Issues that would be governed by state law in a coercive action are equally governed by state law when declaratory relief is sought. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2771 (2d ed.1983) (hereinafter, "Wright, Miller, & Kane"). Indeed, as one commentator has noted:

Since the declaratory remedy is not intended to affect substantive rights, federal substantive rights will, of course, rule the adjudication of federal rights. Similarly, just as in any other type of civil action where the substantive issues are non-federal, *Erie R.R. v. Tompkins* requires a careful and loyal application of state substantive law. . . .

6A Moore's Federal Practice ¶ 57.02[5] (2d ed.1994).

*Commercial Union Ins. Co. v. Walbrook Ins. Co.,* 41 F.3d 764, 772 (1st Cir.1994). Here, the court concludes that the question of whether the remedy of rescission is applicable is a question controlled by Iowa common law.

■ This court has explained that, under Iowa law, fraudulent misrepresentation in the inducement to a contract gives rise to three distinct actions: (1) a cause of action at law for money damages, (2) a defense to a breach-of-contract claim; and (3) a ground for rescission of a contract in an action in equity, such as the Producers assert in Count X of their Second Amended Complaint. *Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1024, 1050 (N.D.Iowa 1998); *Utica Mut. Ins. Co. v. Stockdale Agency,* 892 F.Supp. 1179, 1191

(N.D.Iowa 1995). Under Iowa law, the elements of an equitable claim for rescission based on misrepresentation are: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance." *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996). Unlike a claim of fraudulent misrepresentation, "even innocent misrepresentations may be sufficient to support an action for rescission." *Id.*[21] The general rule in Iowa is that "fraudulent misrepresentations leading to the creation of a contract give rise to a right of rescission." *Robinson v. Perpetual Serv. Corp.*, 412 N.W.2d 562, 568 (Iowa 1987); *accord Midwest Management Corp. v. Stephens*, 291 N.W.2d 896, 906 (Iowa 1980); *Maytag Co. v. Alward*, 253 Iowa 455, 464–66, 112 N.W.2d 654, 659–60 (1962).

■ As noted above, the Grain Elevators contend that rescission in unavailable here because the Producers are in default with respect to the HTAs and that they have legal remedies available to them. The Iowa Supreme Court has held that

Three requirements must be met before rescission will be granted: (1) the injured party must not be in default, (2) the breach must be substantial and go to the heart of the contract, and (3) remedies at law must be inadequate.

*Clark v. McDaniel*, 546 N.W.2d 590, 594 (Iowa 1996) (citing *Potter v. Oster*, 426 N.W.2d 148, 151 (Iowa 1988)). Because these three factors are clearly not elements of an equitable claim for rescission, the court concludes that they constitute affirmative defenses to such a claim. A party is only required to plead "a short and plain statement of the claim showing that the pleader is entitled to relief," *Conley*, 355 U.S. at 47, 78 S.Ct. 99, not facts sufficient to defeat all affirmative defenses. As a result, the factual issues of whether the Producers are in default with respect

to the HTAs or have legal remedies available to them such that would bar the court from granting the equitable relief of rescission are not the proper subjects for the current motion to dismiss. Therefore, this segment of the Grain Elevators' motion is denied.

### 2. Breach of fiduciary duty

The Grain Elevators next challenge Count XII, the Producers' Iowa common law claim for breach of fiduciary duty. The Grain Elevators contend that the Producers have failed to plead facts sufficient to establish that the Grain Elevators had a fiduciary duty to the Producers.

As this court has previously explained, the Iowa Supreme Court has defined a fiduciary duty as follows:

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted that

a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

*Hoffman v. National Med. Enters., Inc.*, 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman*, 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962))....

.... [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any

---

**21.** The elements of a tort claim for misrepresentation are: "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or

damage ." *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996) (citing *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995)).

such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696. *Oeltjenbrun,* 3 F.Supp.2d at 1053 (quoting *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997)); *see also Corcoran v. Land O'Lakes, Inc.,* 39 F.Supp.2d 1139, 1154 (N.D.Iowa 1999) (quoting *Oeltjenbrun* ); *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647–48 (Iowa 1995) (recounting indicia of a fiduciary relationship); *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct.App. 1992) (" 'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship,' " quoting *Kurth,* 380 N.W.2d at 695, in turn quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt. a).

> As this court also explained in *Corcoran,* "Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank,* 461 N.W.2d 849, 852 (Iowa Ct.App.1990). Fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Kurth,* 380 N.W.2d at 698; *accord Engstrand v. West Des Moines State Bank,* 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth*).

*Corcoran,* 39 F.Supp.2d at 1154 (quoting *Oeltjenbrun,* 3 F.Supp.2d at 1053); *accord Zumaris,* 538 N.W.2d at 647–48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.").

Here, it is alleged that the Grain elevators or their agents provided the Producers with advice about HTAs. Specifically, it is alleged that:

> 226. According to the explicit and implicit provisions of the HTA contracts written by or through Titonka, Buffalo Center Bode, Cylinder, Ledyard, Woden, Wesley and West Bend, as well as the lengthy relationships between the various elevators and the respective Plaintiffs, these Defendants undertook to occupy a fiduciary relationship vis-a-vis the Plaintiffs in which the said Defendants undertook to evaluate and monitor the market risk undertaken by the farmers on the futures "side" of the HTA contracts and to inform the farmers on a timely basis of any and all material facts concerning such market risks.

> 227. The said Defendants knew that the Plaintiffs had reposed the highest degree of trust and confidence in them concerning the monitoring, evaluation and communication of these market risks and accepted such repose of trust and confidence by the Plaintiffs.... Said Defendants urged the Plaintiffs beginning in December 1995 not to buy out of the HTA contracts or set the basis and deliver actual grain against them, advising Plaintiffs that it was in Plaintiffs' best interests to roll the HTA contracts forward instead, assuring Plaintiffs that this was [sic] correct way to employ the HTA contracts. Furthermore, certain of said Defendants, including at least Buffalo Center and Titonka, undertook to decide to roll Plaintiffs' HTA contracts forward and claimed to Plaintiffs that they made such decisions based on their belief as to what was best for the Plaintiffs.

Second Amended Compl. at ¶ 226–227.

 The court notes that the allegations here suggest more than a simple arm's-length business relationship between the parties. *Cf. Oeltjenbrun,* 3 F.Supp.2d

at 1053. The Producers allege their belief that the Grain Elevators knew that they were obligated to act with the interests of the Producers in mind. Remembering that the court must "take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff," *St. Croix Waterway Ass'n v. Meyer,* 178 F.3d 515, 518 (8th Cir.1999), the court concludes that the allegations contained in the Second Amended Complaint are sufficient to allege a claim that the Grain Elevators occupied a fiduciary relationship with the Producers. Therefore, the portion of the Grain Elevators' motion to dismiss regarding the Producers' breach-of-fiduciary-duty claim is also denied.

### 3. Fraudulent Inducement

■■■ The Grain Elevators further challenge the sufficiency of the Producers' pleadings with regard to their claim of fraudulent inducement (Count XIII). Specifically, the Grain Elevators assert that the Producers have failed to meet the pleading requirements of Rule 9(b). The elements of a tort claim for fraudulent misrepresentation are: "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or damage." *Hyler,* 548 N.W.2d at 871; *accord McGough,* 526 N.W.2d at 331. As discussed above, *see* section II(B)(2), the court concludes that the Producers have pleaded fraud with particularity against Titonka. Therefore, this portion of the Grain Elevators' motion is denied as to Titonka, but granted as to the remaining Grain Elevators.

### 4. Breach of Contract

The Grain Elevators challenge the Producers' state law breach of contract claim (Count XIV) on the ground that the Producers have based their contract claim on "implied terms and obligations" but the complaint fails to reveal the. source of these implied terms and obligations. The

Grain Elevators' challenge here is overruled. The Producers have generally alleged that the implied terms and conditions arose out of the Grain Elevators' maintaining of margin accounts on the Chicago Board of Trade for the HTAs and the terms of the HTAs. Moreover, the Producers pleaded the implied terms and obligations which they allege the Grain Elevators breached. The Producers are not obligated under Rule 8 to do more. Therefore, this portion of the Grain Elevators' motion is denied.

### 5. Negligence claim

■■■ Finally, the Grain Elevators seek dismissal of the Producers' claim for negligence (Count XV) on the ground that the Producers cannot legally seek recovery of economic losses under their claim of negligence. The Grain Elevators are correct in their assertion that, under Iowa law, a plaintiff can recover for purely economic loss only in contract and not in tort law. *Flom v. Stahly,* 569 N.W.2d 135, 140 (Iowa 1997); *Nelson v. Todd's Ltd.,* 426 N.W.2d 120, 123–25 (Iowa 1988); *Ethyl Corp. v. BP Performance Polymers, Inc.,* 33 F.3d 23, 25 (8th Cir.1994), *cert. denied,* 513 U.S. 1153, 115 S.Ct. 1108, 130 L.Ed.2d 1073 (1995). The Producers argue that *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.,* 345 N.W.2d 124, 126 (Iowa 1984), supports their position that the economic loss rule does not apply here "where Plaintiffs allege a duty of care owed by one in privity and possessing special expertise." The Producers' brief at p.73. The court disagrees. In *Nebraska Innkeepers,* businesses, affected by the closing of a bridge, brought suit against the contractor and seller of the steel used in the bridge. *Nebraska Innkeepers,* 345 N.W.2d at 125. The plaintiffs had lost profits because the improperly made steel had cracked, causing closing of the bridge and fewer customers. *Id.* In *Nebraska Innkeepers,* the Iowa Supreme Court found the economic, nonphysical losses of the businesses were too remote. *Id.* at 128–29. The Iowa

Supreme Court explained the reason for the distinction between economic and property losses:

> Courts which have addressed this issue have repeatedly expressed concern that a contrary rule would open the door to virtually limitless suits, often of a highly speculative and remote nature. Such suits would expose the negligent defendant to a severe penalty, and would produce serious problems in litigation, particularly in the areas of proof and apportionment of damages.

*Id.* at 127. The Iowa court agreed with the finding by the United States District Court for the Western District of Wisconsin that the injured party must have at least some ownership or property interest, adding "allowance of a claim for purely economic damages arising from another's negligent actions would 'enter a field that has no just or sensible stopping point.'" *Id.* at 128. Therefore, the court concludes that under Iowa law, claims for purely economic loss are recoverable only in contract and not in tort law. This segment of the Grain Elevators' motion to dismiss is granted and Count XV of the Second Amended Complaint is dismissed.

## IV. CONCLUSION

The court grants in part the Grain Elevators' motion to dismiss Counts II, VI, IX and XIII because the court finds that the fraud claims in these counts have not been pleaded with the particularity required by Federal Rule of Civil Procedure 9(b). Here, with the exception of Titonka, the complaint does not sufficiently allege the existence of an agency relationship between any of the other Grain Elevators and FAC–MARC or Agri–Plan. The significance of the lack of an agency relationship between the other Grain Elevators and FAC–MARC or Agri–Plan is that, without such a relationship, the Producers have failed to make sufficient factual allegations of scienter on the part of the other Grain Elevators. Accordingly, with respect to Counts II, VI, IX and XIII, the Grain Elevator's motion is **granted** as to Farmers Co-op, Buffalo Center, FCS, West Bend, FCE, Bode Co-op, and Cylinder Co-op, but **denied** as to Titonka. The Grain Elevators' motion is also **granted** as to Count VI. The court concludes that no private cause of action exists under the excessive speculation provisions found in 7 U.S.C. § 6a. The Grain Elevators' motion is **denied** as to Count VIII. The court concludes that the factual allegations contained in the Second Amended Complaint are sufficient to satisfy the pleading requirements of the federal rules with regard to causation. The court further **denies** that portion of the Grain Elevators' motion to dismiss, with regard to Count XI, in which the Grain Elevators' argue that the allegations contained in the Second Amended Complaint are insufficient to state a claim that the Grain Elevators were CTAs under the CEA. Viewing all well-pleaded factual allegations in the light most favorable to the Producers, the court concludes that the allegations contained in the Second Amended Complaint are sufficient to state a claim that the Grain Elevators were CTAs under the CEA. The Gain Elevators' motion is **denied** with respect to Counts VI, VII, VIII, and IX. The court concludes that, because the inquiry regarding these claims requires the court to examine "the intentions of the parties" and determine "whether the parties contemplated physical delivery," the question of whether the HTAs are futures contracts or cash forward contracts is a fact intensive issue that precludes determination on a motion to dismiss. The Grain Elevators' motion is also **granted** with respect to the Producers' claims for punitive damages under 7 U.S.C. § 25(3)(b). The Grain Elevators' motion is **denied** with respect to the Producers' RICO claim against Titonka. The Grain Elevators' motion is also **denied** with respect to Count X, the Producers' claim for rescission because the factual issues of whether the Producers are in default with respect to the HTAs or have legal remedies available to them such that would bar the court from granting the

equitable relief of rescission are not proper subjects for the current motion to dismiss. Because the court concludes that the allegations contained in the Second Amended Complaint are sufficient to allege a claim that the Grain Elevators occupied a fiduciary relationship with the Producers, the court further **denies** the Grain Elevators' motion with respect to Count XII. The court also **denies** the Grain Elevators' motion as to Count XIV, the Producers' breach of contract claims. Finally, the court grants the Grain Elevators' motion to dismiss with respect to Count XV, the Producers' negligence claim. The court concludes that, under Iowa law, claims for purely economic loss are recoverable only in contract and not in tort law.

**IT IS SO ORDERED.**